his creditors' reach in sunny Jamaica, but not out of his.[1]

**Estella ROBERTS and Bertha Burden, Appellants,**

**v.**

**VAN BUREN PUBLIC SCHOOLS; James R. Tate and James Starbird, Individually and as Superintendent and Principal of Van Buren Public Schools; Gene Neidecker, President; C.J. Franklin, Iverson Riggs, Ray Nelson, Darral Sparkman, Dr. Richard Darden, Otis Arnold, and Robert Daugherty, Individually and as Members of the Board of Directors of the Van Buren Public Schools, Appellees.**

No. 84–2244.

United States Court of Appeals,
Eighth Circuit.

Submitted April 11, 1985.

Decided Sept. 11, 1985.

Rehearing and Rehearing En Banc
Denied Nov. 6, 1985.

---

Marcia Barnes, Little Rock, Ark., for appellants.

Ben Core, Fort Smith, Ark., for appellees.

Before ROSS and JOHN R. GIBSON, Circuit Judges, and COLLINSON,* Senior District Judge.

JOHN R. GIBSON, Circuit Judge.

Estella Roberts and Bertha Burden appeal a judgment entered on a jury verdict against them on their claim under 42 U.S.C. § 1983 (1982) that the Van Buren Public Schools Board of Directors impermissibly failed to renew their teaching contracts in retaliation for their exercise of their first amendment rights. The teachers argue that the district court erred in submitting to the jury the constitutional issue of whether their conduct was protected speech. We vacate and remand on the first amendment issue as to Roberts insofar as her claim is based on certain union activities but affirm the judgment of the district court in all other respects.

Roberts and Burden were fifth-grade teachers at City Heights Elementary School in Van Buren, Arkansas. On evaluations near the end of the 1980–81 school year, Roberts' second in the district and Burden's first, school principal James Starbird rated them both "satisfactory"—the highest rating—in every category.

Later that month, however, the teachers filed with Starbird three written grievances on forms developed by the Van Buren Education Association, local affiliate of the Arkansas Education Association teachers union. Two of the grievances related to the fifth-grade trip to Little Rock, the first expressing dissatisfaction with the manner in which parental complaints concerning seating arrangements for the bus had been handled, and the second criticizing the failure of the school to provide monetary support for the trip. The third grievance pertained to the inadequacy of teaching supplies and particularly to the necessity of sacrificing *Weekly Readers* to obtain greater classroom allowances for other supplies. Starbird passed these grievances directly to Superintendent of Schools James R. Tate,

* The HONORABLE WILLIAM R. COLLINSON, Senior United States District Judge for the Eastern and Western Districts of Missouri, sitting by designation.

who responded by directing the teachers either to meet with him to work out the problems or to present the grievances directly to the school board (for which purpose he offered to call a special meeting if they desired). When Roberts and Burden answered indicating their desire to meet, however, Tate stated that he saw no purpose in such a meeting and said he felt the grievances indicated a lack of confidence in both him and Starbird.

The next spring when Starbird completed teacher evaluations for the 1981–82 school year, he dropped Roberts' and Burden's ratings to "needs to improve" in approximately half the categories and recommended that the district not renew the contract of either. He stated as to both teachers that the grievances filed the previous spring had been responses to his attempts to work with them on their deficiencies and had accused him of incompetence and dishonesty and threatened him with legal action. He further stated as to Roberts that her efforts to recruit union members had "often attempted to create poor relations between administration and faculty, instead of cooperation for the good of the children." Plaintiff's Exhibit No. 12. Superintendent Tate, relying in part on Starbird's evaluations and comments, recommended to the Board that Roberts and Burden's contracts not be renewed, and the Board unanimously agreed.

After their requests for hearings were denied, Roberts and Burden filed this action. They allege that Starbird, Tate, and the Board, by acting in retaliation for their protected speech activities, deprived them of their rights under the first and fourteenth amendments,[1] and, in failing to bring to their attention and help remedy their teaching deficiencies, deprived them of their rights under the Teacher Fair Dismissal Act of 1979. Ark.Stat.Ann. § 80–1264.6 (1980) (repealed effective July 4,

1983[2]). Roberts' and Burden's motion for a preliminary injunction requiring that they be reinstated pending trial on the merits was denied, and we affirmed. *Roberts v. Van Buren Public Schools,* 731 F.2d 523 (8th Cir.1984).

At the subsequent trial the district court submitted to the jury the following interrogatory with respect to each teacher:

Do you find that [teacher's name] was engaged in activity protected by the First Amendment and that the protected activity was a substantial or motivating factor in *any of the defendants* decisions not to renew her teaching contract?

The jury answered "no" to this interrogatory with respect to both Roberts and Burden and similarly answered the interrogatory relating to the state law claim in favor of the school district. Judgment was entered consistent with these special verdicts, and after the district court denied the teachers' motions for judgment notwithstanding the verdict or a new trial, this appeal followed.

## I.

Roberts' and Burden's constitutional claims invoke the holding in *Pickering v. Board of Education,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), that "[p]ublic employee[s do] not relinquish First Amendment rights to comment on matters of public interest by virtue of government employment." *Connick v. Myers,* 461 U.S. 138, 140, 103 S.Ct. 1684, 1686, 75 L.Ed.2d 708 (1983). Consideration of such claims involves a three-step analysis. First, plaintiffs must demonstrate that their conduct was protected; second, plaintiffs must demonstrate that such protected conduct was a substantial or motivating factor in the adverse employment decision; and third, the employer may show that the employment action would have been taken

1. Roberts and Burden also asserted that due process required that they receive hearings since the circumstances of their nonrenewals resulted in stigma affecting their opportunities for future employment, thus implicating their liberty interests. The jury also found for the

district on this claim, and this result is not challenged on appeal.

2. Revised teacher dismissal provisions were enacted and are codified at sections 80–1266 to 80–1266.10 of the Arkansas Statutes.

even in the absence of the protected conduct. *Mt. Healthy City School District Board of Education v. Doyle*, 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977); *Bowman v. Pulaski County Special School District*, 723 F.2d 640, 643–44 (8th Cir.1933).

■■■ Identification of protected activity since *Connick* is a two-step process in itself. As a threshold matter, the speech must have addressed a "matter of public concern," 461 U.S. at 143, 146, 103 S.Ct. at 1687, 1689; *see Collins v. Robinson*, 568 F.Supp. 1464, 1468 (E.D.Ark.1983), *aff'd per curiam*, 734 F.2d 1321 (8th Cir.1984); then, the interest of the employee in so speaking must be balanced against "the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering*, 391 U.S. at 568, 88 S.Ct. at 1735. This "*Pickering* balance," as it has come to be known, looks to the following factors:

> (1) the need for harmony in the office or work place; (2) whether the government's responsibilities require a close working relationship to exist between the plaintiff and co-workers when the speech in question has caused or could cause the relationship to deteriorate; (3) the time, manner, and place of the speech; (4) the context in which the dispute arose; (5) the degree of public interest in the speech; and (6) whether the speech impeded the employee's ability to perform his or her duties.

*Bowman*, 723 F.2d at 644.

■■■ Roberts and Burden argue that the district court erred in submitting to the jury through the interrogatories the issue of whether or not the speech and activities in which they engaged were protected under the first amendment. "The inquiry into the protected status of speech is one of law, not fact." *Connick*, 461 U.S. at 148 n. 7, 103 S.Ct. at 1690 n. 7. While proper resolution of this issue, particularly as to the balancing, may involve determination

by the jury of certain underlying facts, *e.g.*, *McGee v. South Pemiscot School District R–V*, 712 F.2d 339, 342 (8th Cir.1983) (jury to decide whether speech created disharmony between employee and immediate supervisor); *see Kim v. Coppin State College*, 662 F.2d 1055, 1062, 1064 (4th Cir.1981); *Schneider v. City of Atlanta*, 628 F.2d 915, 919 n. 4 (5th Cir.1980), the ultimate decision is for the court. *Brockell v. Norton*, 732 F.2d 664, 667 (8th Cir.1984); *see Czurlanis v. Albanese*, 721 F.2d 98, 102, 105 (3d Cir.1983). Thus, use of the jury instruction here was clearly improper.[3] *See Loya v. Desert Sands Unified School District*, 721 F.2d 279, 281–82 & n. 2 (9th Cir.1983); *Stern v. Shouldice*, 706 F.2d 742, 747–48 & n. 2 (6th Cir.), *cert. denied*, 464 U.S. 993, 104 S.Ct. 487, 78 L.Ed.2d 683 (1983); *Schneider*, 628 F.2d at 920.

■■■ Furthermore, the instructions in this case have two additional shortcomings. First, the issue of whether the protected conduct was a substantial factor in the employment decision was combined with the issue of whether the conduct was protected so that we do not know how causation was decided by the jury; and second, the jury, because it found in the negative to the two-issue interrogatory, was instructed not to decide the question of whether Roberts and Burden would have been renewed absent any protected conduct. This latter question and the causation question, in contrast to the protected speech question, are issues of fact to be determined by the jury, *Collins*, 568 F.Supp. at 1468; *Wheeler v. Mental Health & Mental Retardation Authority*, 752 F.2d 1063, 1069 (5th Cir.1985), *cert. denied*, — U.S. ——, 106 S.Ct. 78, 88 L.Ed.2d 64 (1985); *see Greminger v. Seaborne*, 584 F.2d 275, 278 (8th Cir.1978); and a jury finding on either could have disposed of this case (or at least substantially altered the issues on appeal). Now, should we conclude that any of the conduct in question here is protected, we will have

---

3. The school district's arguments that Roberts and Burden failed to properly object to the jury instructions and interrogatories and invited the

error through their requested instructions have no support in the record.

to reverse and remand for further proceedings, a particularly regrettable consequence given the length of the original trial. *See Loya v. Desert Sands Unified School District,* 721 F.2d 279, 281–82 & n. 2 (9th Cir.1983) (reversing and remanding on similar instruction); *cf. Derrickson v. Board of Education,* 703 F.2d 309, 316–17 (8th Cir.1983) (district court's causation findings inadequate when they failed to address the speech that was actually protected). It is essential in cases such as this that the factual issues be submitted to the jury in separate interrogatories and that the consideration of these interrogatories not be foreclosed by earlier answers so that the court will be able to properly combine the factual findings with its legal conclusions.

## II.

■ Because the protected nature of speech is a question of law, however, we may determine this issue in the first instance at the appellate level, possibly making remand unnecessary or limiting the scope of the issues to be considered.[4] *Hughes v. Whitmer,* 714 F.2d 1407, 1418 n. 11 (8th Cir.1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 1275, 79 L.Ed.2d 680 (1984); *Czurlanis,* 721 F.2d at 102. *But cf. Patteson v. Johnson,* 721 F.2d 228, 232 (8th Cir.1983) (remand to give district court the initial opportunity to properly balance the competing interests).

## A.

■ In determining whether speech addresses a matter of public concern, we consider the "content, form, and context of a given statement, as revealed by the whole record." *Connick,* 461 U.S. at 147–48 & n. 7, 103 S.Ct. at 1690 & n. 7. We need not proceed to the *Pickering* balance

when the employee spoke not as a citizen but as an employee expressing a personal grievance as to internal office policy. *Id.* at 146, 154, 103 S.Ct. at *Collins,* 568 F.Supp. at 1468. The state has a greater interest in regulating the speech of its employees than it has in regulating the speech of its citizenry in general, *Pickering,* 391 U.S. at 568, 88 S.Ct. at 1734, and respect for fundamental rights does not require that the first amendment be read to afford to state employees a grant of immunity for job-related grievances not afforded to those who do not work for the state. *Connick,* 461 U.S. at 147, 103 S.Ct. at 1690.

■ The public nature of the subject of the speech, however, is not negated by the fact that, as here, the employees chose to communicate their concerns privately. *Id.* at 146, 103 S.Ct. at 1689 (citing *Givhan v. Western Line Consolidated School District,* 439 U.S. 410, 99 S.Ct. 693, 58 L.Ed.2d 619 (1979)). A teacher has a "constitutional right * * * to privately express to his superiors, in a reasonable manner, his criticism of * * * educational or disciplinary policies." *Derrickson v. Board of Education,* 703 F.2d 309, 316 (8th Cir.1983).

■ That the content of rules governing the conduct of fifth-graders on a field trip halfway across the state is a matter of public concern is made clear by the degree of parental dissatisfaction apparently expressed after Roberts and Burden distributed the itinerary and behavior guidelines. *See Bowman,* 723 F.2d at 644 ("The question of what constitutes the proper care and education of children is one of the most frequently debated issues in the public forum. * * * [A]ctivities of the parents are a good indication of the public's interest in these events."). Conceivably, it also might be of public concern whether the school district was being responsive to such paren-

---

4. The school district's argument that submission of the protected speech issue to the jury was "harmless error" merely assumes that the jury found the speech unprotected and that it was correct in so finding and does not foreclose our consideration of that issue of law. *See Loya v. Desert Sands Unified School District,* 721 F.2d 279, 282 (9th Cir.1983) (submission of balancing test to jury could not be regarded as nonprejudicial error where court determined that at least most of the speech in question was protected); *see also Schneider v. City of Atlanta,* 628 F.2d 915, 920 & n. 5 (5th Cir.1980) (defendant prejudiced by submission of first amendment question to jury where jury found that plaintiff's rights had been violated.)

tal input. Roberts' and Burden's grievance, however, is more fairly construed as objecting to the internal aspects of dealing with complaints—Starbird's refusal to tell them the names of the complaining parents and his lack of clarity as to what changes he expected them to make—as well as to the manner in which the rules were reviewed before promulgation. The charges in the grievance went more to the relationship between Starbird and the teachers as supervisor and employees rather than to the discharge by Starbird and the school of their public function of education. *See Connick,* 461 U.S. at 148, 103 S.Ct. at 1690; *cf. Renfroe v. Kirkpatrick,* 722 F.2d 714 (11th Cir.) (per curiam) (teacher's grievance concerned whether, because of seniority and experience, she was entitled to a full-time rather than a job-sharing position; not whether job sharing was inimical to welfare of students), *cert. denied,* —— U.S. ——, 105 S.Ct. 98, 83 L.Ed.2d 44 (1984). Thus, we conclude that Roberts' and Burden's first grievance did not involve protected speech.

■ The other grievances to the contrary touched on expenditures of public funds—whether the district should provide support for the educational trip to the state capital; whether teachers should have to use their own money to properly do their jobs; and whether adequate money was available for classroom supplies and how such money should be used. The seminal *Pickering* case itself involved speech as to a school system's need for more funds and its allocation of existing funds. 391 U.S. 563, 88 S.Ct. 1731; *e.g., Greminger v. Seaborne,* 584 F.2d 275, 277 (8th Cir.1978) ("Allocation of funds for increased teachers' salaries is a subject of public concern upon which teachers may certainly comment."); *Knapp v. Whitaker,* 757 F.2d 827, 840–41 (7th Cir.1985) (inequitable mileage allowances and alleged failure of school district to provide liability insurance for teachers transporting students to extracurricular activities matters of public concern), *petition for cert. filed,* 53 U.S.L.W. 3854 (U.S. June 4, 1985) (No. 84–1824). Money for the state capital outing was raised by parents and students, a public involvement inconsistent with any characterization of the trip as an "internal office affair" within the contemplation of *Connick.* 461 U.S. at 149, 103 S.Ct. 1691.

■ Upon applying the *Pickering* balance to these matters of public concern, however, we may now take into account the fact that the speech, despite its subject, was made privately: " 'When a government employee personally confronts his immediate superior, the employing agency's institutional efficiency may be threatened not only by the content of the employee's message but also by the manner, time, and place in which it is delivered.' " *Connick,* 461 U.S. at 152–53, 103 S.Ct. at 1693 (quoting *Givhan v. Western Line Consolidated School District,* 439 U.S. 410, 415 n. 4, 99 S.Ct. 693, 696 n. 4, 58 L.Ed.2d 619 (1979)); *accord Nathanson v. United States,* 702 F.2d 162, 165 (8th Cir.), *cert. denied,* —— U.S. ——, 104 S.Ct. 352, 78 L.Ed.2d 316 (1983). Roberts' and Burden's speech in the grievances, unlike the speech in *Bowman,* 723 F.2d at 644–45, was not in response to conduct or decisions of the school district or other school personnel at a time when such conduct or decisions were the subject of active public dispute. Superintendent Tate's letter indicates that the fifth-grade trip as funded had been "approved," presumably by the Board or the administration, and that the decision between *Weekly Readers* and more supply money had been made a month before at a faculty meeting. The concerns underlying the *Pickering* balance suggest that a government as an employer has a legitimate interest in achieving compliance with decisions that, while once open to dispute and discussion, have been made through proper channels. *See Kelleher v. Flawn,* 761 F.2d 1079, 1084 (5th Cir.1985) ("It is firmly established that the First Amendment's shield does not extend to speech and conduct amounting to insubordination directed at school officials.").

Because the time and manner of the speech here implicate to a great degree

legitimate concerns of the government, as an employer, with insubordination versus respect for proper authority and decision-making procedures, we conclude as a matter of law that the grievances filed by Roberts and Burden were not protected under the first amendment.

### B.

While this disposes of the first amendment claim as to Burden, we still must consider as to Roberts whether certain union activities also alleged to be a motive for her discharge were in fact constitutionally protected.[5]

■■■ We have stated, citing Supreme Court precedent, that it is "clear that * * * a public employer may not constitutionally prohibit its employees from joining together in a union, or from persuading others to do so." *Arkansas State Highway Employees Local 1315 v. Kell,* 628 F.2d 1099, 1102 (8th Cir.1980) (relying on *Smith v. Arkansas State Highway Employees Local 1315,* 441 U.S. 463, 99 S.Ct. 1826, 60 L.Ed.2d 360 (1979) (per curiam)); *see also Norbeck v. Davenport Community School District,* 545 F.2d 63, 67 (8th Cir.1976) (constitutional right to join a union extends to teachers the same as to other public employees), *cert. denied,* 431 U.S. 917, 97 S.Ct. 2179, 53 L.Ed.2d 227 (1977). Thus, the only union activity cited by Starbird in his evaluation of Roberts—her efforts at recruiting other teachers as members—was protected conduct. To the degree that the nonrenewal decision may have been influenced by further union activities of Roberts shown by the record—the posting of notices on the bulletin board in the teachers' lounge, the distribution of pamphlets and other information, the collection of dues, and the handling of inquiries concerning the credit union—we conclude that this conduct also was within the scope of first amendment freedom of association. As we

have recognized, the right of union membership would be "meaningless" unless an employee's right to participate in union activities were also recognized. *Carter v. Kurzejeski,* 706 F.2d 835, 838 (8th Cir.1983) (employees held leadership positions in union, filed numerous unfair labor practice complaints, and participated in grievance proceedings); *see also Professional Association of College Educators v. El Paso County Community College District,* 730 F.2d 258, 262 (5th Cir.) ("[T]he first amendment is violated by state action whose purpose is * * * to intimidate public employees * * * from taking an active part in [union] affairs or to retaliate against those who do.") (footnote omitted), *cert. denied,* — U.S. —, 105 S.Ct. 248, 83 L.Ed.2d 186 (1984); *Columbus Education Association v. Columbus City School District,* 623 F.2d 1155, 1159 (6th Cir.1980) ("[A] reprimand to retaliate against the zealous representation by a union spokesperson of a member's grievance impermissibly infringes upon the constitutional right of free association * * *.").

■■■ As in the case of speech, however, an associational right must be balanced against, and may be overridden by, the government's interest as an employer in efficiency. For example, association will not be protected if the employee engages in the allegedly protected activities on the job, interfering with the performance of his duties, *Hughes v. Whitmer,* 714 F.2d 1407, 1424 (8th Cir.1983), *cert. denied,* — U.S. —, 104 S.Ct. 1275, 79 L.Ed.2d 680 (1984), or if the employee harasses coworkers and disrupts operations. *Greminger v. Seaborne,* 584 F.2d 275, 278 (8th Cir.1978); *cf. Norbeck, supra* (school may prevent principal from representing in collective bargaining the teachers whom he was hired to supervise, discipline, and evaluate).

---

5. At various points—though not in their pleadings or closing arguments to the jury—Roberts and Burden have suggested that their speech in proposing to the PTA that an Easter party not be held for fifth-graders was among the protected conduct against which the Board retaliated.

The main concern of the Board (and the parents) in regard to this incident, however, was the teachers' subsequent failure to allow their classes to attend the party when their proposal was not adopted, not the teachers' speech.

While Starbird stated in his evaluation of Roberts that her recruiting activities caused disharmony, the record does not demonstrate that that was the case. The only difficulties between Roberts and other teachers shown by the evidence resulted from disputes over other matters; and while Starbird could name none of the numerous teachers he said complained to him of being badgered by Roberts to join the union, several testified that none of Roberts' organizational activities was offensive.

■ Assuming Roberts' union activities were protected, however, she would still have to show that her discharge had been based in substantial part on those activities. Superintendent Tate, for example, denied that he considered the references in Starbird's evaluation in recommending that the Board not renew Roberts, and all of the Board members testified that their votes would have been the same had the union activities not been mentioned. Three members of the Board specifically stated that they would have voted for nonrenewal even absent Tate's recommendation, and four mentioned receiving parental complaints about Roberts. Starbird's evaluation also cited Roberts' poor rapport with administration, staff, and parents and her uncompromising viewpoints and insistence that she was always right plus a high rate of requests from parents that their children not be assigned to her classroom. Substantial evidence was introduced concerning the numerous parental complaints. While the evidence was not the strongest that Roberts' union activities were a motivating factor in the Board's failure to renew her contract and that, absent such activities, her contract would have been renewed, we believe that, giving her the benefit of all favorable inferences, these are issues of fact to be decided by the jury. The union activities are mentioned in Starbird's evaluation, and Tate, while denying reliance on that conduct, admitted that it was difficult

for him to say whether he would have recommended nonrenewal absent Starbird's evaluation.[6] Because the interrogatory submitted to the jury in this case combined the issues of protected conduct and causation, we cannot tell how the jury decided the latter issue, and we must remand for further proceedings on Roberts' claim that she was impermissibly discharged for her union activities.

### III.

■ Roberts and Burden also argue that the district court's instructions on the first amendment claim were deficient in that, in a certain passage, the name of defendant Starbird was omitted, confusing the jury as to whether it could find a constitutional violation based on his conduct alone. To the extent that the teachers rely on their grievances as protected speech, any error was harmless as we have found against them on that issue as matter of law; to the extent that Roberts relies on her union activities, any error may be cured on remand. We observe that, should the individual liability stage be reached, the district court should reconsider its ruling, in response to an objection by Roberts and Burden, that the existence of qualified immunity is a matter of fact for the jury. *See Mitchell v. Forsyth,* — U.S. —, 105 S.Ct. 2806, 2818, 86 L.Ed.2d 411 (1985) (reference to the "purely legal question on which [defendant's] claim of [qualified] immunity turns"); *Harlow v. Fitzgerald,* 457 U.S. 800, 815–16, 818, 102 S.Ct. 2727, 2736–37, 2738, 73 L.Ed.2d 396 (1982) ("On summary judgment, the judge appropriately may determine, not only the currently applicable law, but whether that law was clearly established at the time an action occurred.") (footnote omitted); *Joseph v. Brierton,* 739 F.2d 1244, 1249 (7th Cir. 1984); *Czurlanis v. Albanese,* 721 F.2d 98, 108 (3d Cir.1983); *Windsor v. The Tennes-*

6. Furthermore, as we observed in a footnote in our opinion reviewing the denial of the preliminary injunction, the decline in Roberts' evaluation marks may not be used to justify her dismissal insofar as the lower scores may be traced to Starbird's disapproval of her union activities. 731 F.2d at 527 n. 3 (citing with approval *Hickman v. Valley Local School District Board of Education,* 619 F.2d 606 (6th Cir.1980) ).

*sean,* 719 F.2d 155, 165 (6th Cir.1983), *cert. denied,* —— U.S. ——, 105 S.Ct. 105, 83 L.Ed.2d 50 (1984); *cf. Tubbesing v. Arnold,* 742 F.2d 401 (8th Cir.1984) (finding qualified immunity after district court denied summary judgment on the issue).

## IV.

Finally, Roberts and Burden argue that the jury instructions and interrogatories on their state law claim erroneously required them to show that they "suffered damages as a proximate cause" of Starbird's failure to comply with the Arkansas Teacher Fair Dismissal Act. Although the specific provision of the statute at issue here—that requiring principals to raise with teachers and attempt to help remedy their teaching deficiencies [7]—apparently has not been construed by the Arkansas courts, we believe certain general principles developed in other teacher dismissal cases are applicable.

▮▮▮ The Arkansas Supreme Court has held that a school district may reasonably be expected to "comply substantially" with statutory requirements and its own personnel policies. *McElroy v. Jasper School District,* 273 Ark. 143, 617 S.W.2d 356, 357, 358 (1981); *Maxwell v. Southside School District,* 273 Ark. 89, 618 S.W.2d 148, 149 (1981). "Strict compliance" is not necessary absent a showing of prejudice from the want of such conformity, *Lee v. Big Flat Public Schools,* 280 Ark. 377, 658 S.W.2d 389, 390 (1983); however, a nonrenewal may successfully be challenged when the district's actions do not even reach the level of "colorable compliance." *Maxwell,* 618 S.W.2d at 150. "Proximate cause" as such plays no role in this analysis.

▮▮▮ But here, the actual focus of the jury instructions was whether, despite any technical variance from the statute by the school district, Roberts and Burden were aware of the problems that lead to their nonrenewal and whether the district took any steps to help them correct such problems. Similar factors have been considered relevant by the Arkansas Supreme Court in determining whether actions constituted "substantial compliance" with a statute or school policy. *E.g., McElroy, supra* (school district substantially complied with its policy concerning teacher evaluations when, although plaintiff neither received nor signed written copies of such evaluations, plaintiff was aware of their contents, had frequent conferences and had received counseling as to her problems in maintaining classroom discipline); *Lee, supra* (arguably unclear letter sufficient to give notice of nonrenewal in light of earlier conversations and communications); *Allred v. Little Rock School District,* 274 Ark. 414, 625 S.W.2d 487 (1981) (same). Thus, reading the charge as a whole, we conclude that, despite some less than ideal terminology, the instructions fairly and adequately put before the jury the factors appropriate to the decision of Roberts' and Burden's state law claim, and we will not disturb the verdict.[8] *See Monahan v. Flannery,* 755 F.2d 678, 681 (8th Cir.1985).

7. Section 80–1264.6 provided in part that [w]henever a principal or other school administrator charged with supervision of a teacher finds it necessary to admonish a teacher for a reason that the administrator believes may lead to termination or nonrenewal, the administrator shall bring the matter to the attention of the teacher involved in writing and shall document the efforts which have been undertaken to assist the teacher to correct whatever appears to be the cause for potential termination or nonrenewal.
For the current statutory language, see Ark.Stat. Ann. § 80–1266.6 (Supp.1983).

8. The school district, in addition to defending the instructions, also argues that for two reasons the state claim should never have reached the jury: (1) the district court was without jurisdiction because the Arkansas Teacher Fair Dismissal Act provides for judicial review of Board decisions only as to "nonprobationary" teachers, that is, those who have been employed with the district at least three successive years; and (2) the statute on which Roberts and Burden relied does not grant a private right of action. Arkansas cases, however, clearly contemplate that, under a proper pleading, a probationary teacher may bring an original action in circuit court alleging that a school district has breached its contract by failing to comply with statutes and policies that may be implicitly incorporated therein. *Head v. Caddo Hills School District,* 277 Ark. 482, 644 S.W.2d 246 (1982); *Springdale*

We affirm the judgments against Roberts and Burden as to their claims under Arkansas law, against Burden as to her claim under the first and fourteenth amendments, and against Roberts as to her claim under the first and fourteenth amendments insofar as she relies on the grievances as protected speech. We vacate the judgment on the jury verdict against Roberts on her constitutional claim insofar as she relies on her union activities, and we remand for a new trial in conformity with this opinion on the issue of whether the school district impermissibly failed to renew her contract in retaliation for any such activities which may be found to be protected.

*School District v. Jameson,* 274 Ark. 78, 621 S.W.2d 860 (1981); *see Nordin v. Hartman Public Schools,* 274 Ark. 402, 625 S.W.2d 483, 486 (1981) (Adkisson, C.J., concurring). Given our

conclusion on the instruction issue, we need not decide whether Roberts and Burden successfully pled such an action.