**Bettie FARR, Plaintiff–Appellant, Cross–Appellee,**

v.

**Eugene GRUBER, et al., Defendants– Appellees.**

**Monticello Insurance Company, Defendant–Appellant.**

**Nos. 90–3831 and 91–1016.**

United States Court of Appeals, Seventh Circuit.

Argued Sept. 19, 1991.

Decided Dec. 4, 1991.

Rehearing and Rehearing En Banc Denied Jan. 27, 1992.

John F. Maloney, Mary A. Moore, argued, Mark A. Peterson, McNally, Maloney & Peterson, Milwaukee, Wis., for plaintiff-appellant, cross-appellee.

Vance M. Waggoner, Denissen, Kranzush, Mahoney & Ewald, Donald R. Zuidmulder, argued, Zuidmulder, Appel & Gammeltoft, Green Bay, Wis., for defendants-appellees.

Bruce B. Deadman, George F. Savage, argued, Everson, Whitney, Everson & Brehm, Green Bay, Wis., for defendant-appellant.

Before COFFEY and EASTERBROOK, Circuit Judges, and FAIRCHILD, Senior Circuit Judge.

EASTERBROOK, Circuit Judge.

Bettie Farr served as the clerk of the Village of Howard, Wisconsin, between 1980 and 1989, adding the duties of treasurer in 1986 and economic development coordinator in 1987. She served at the pleasure of the Village's board of trustees. In May 1989 Eugene Gruber and Roger Sachs, two of the trustees, procured her dismissal from all three posts. The trustees held a meeting at which Farr and her attorney were allowed to present evidence and argument, after which they voted 5–4 to remove her. Gruber, Sachs, and the three trustees who joined them attribute their dissatisfaction to Farr's drinking, poor office management, and verbal abuse of both taxpayers and a student who worked in the office. Farr contends that her deportment was exemplary. She believes that Gruber and Sachs were retaliating for her role as a go-between who, at the request of George Speaker, one of the Village's trustees, gave to Dennis Duffy, the Village's attorney, information about a contract between the Village and Gruber's construction company. Speaker was concerned that the contract may have exceeded $7,500, the limit for self-interested transactions established by Wis.Stat. § 946.13.

Farr began this suit under 42 U.S.C. § 1983 against the Village and the five trustees who voted against her, raising not only a variety of claims under the due process clause but also a plenitude of other claims, some based on state law. The only remaining federal claim is one added to the suit after its commencement: that Sachs retaliated against her for filing the lawsuit by asking the local assessor to reassess the Farrs' residence. The district court granted summary judgment to the defendants on that contention and all other claims. Farr has appealed—and so has the defendants' insurer, whose presence creates jurisdictional problems.

Wisconsin allows direct actions against insurers. Farr named among the defendants Monticello Insurance Company, the insurer of the Village and its officers. Monticello sought summary judgment on the ground that its policy does not cover civil rights claims or wrongful discharge actions. This precipitated a contest between Monticello and the other defendants. On April 26, 1990, the district court issued an opinion concluding that disputed issues of material fact prevented a resolution of the scope of coverage. Before the court resolved that issue, it issued summary judgment against Farr. The judgment, entered on November 16, 1990, provides:

> IT IS ORDERED AND ADJUDGED the Court **Denies** the plaintiff's motion for summary judgment; **grants** the summary judgment motion of the defendant Village of Howard; **grants** the summary judgment motion of defendants Sachs and Gruber; and **grants** the summary judgment motion of defendants Williams, Williquette, and Monson.

Having listed the motions it was granting and denying, the court neglected to provide for a disposition of the case. As we keep repeating, there is a gap between granting motions and disposing of claims. E.g., *Stamatakis Industries, Inc. v. J. Walter Thompson, U.S.A., Inc.*, 944 F.2d 382 (7th Cir.1991). This document does not end the *case*, because it does not end the litigation against Monticello or otherwise specify that Farr has lost outright. It does not resolve the dispute between Monticello and the other defendants. Indeed, the document would be ambiguous even had it

mentioned Monticello, for it is common to grant or deny summary judgment on fewer than all claims in an action.

Farr took an appeal against Gruber and Sachs limited to two of the eight claims in the amended complaint. Monticello appealed against all of the other parties. None of the parties noticed the absence of a final judgment until the court inquired at oral argument. Counsel agreed at oral argument that proceedings are over in the district court—that Farr has no remaining claims against any party. This also means that Monticello has prevailed implicitly against all parties, as it cannot be liable on the policy if none of the insureds is liable. (There is no dispute about coverage of litigation expenses.) As a prevailing party, Monticello cannot appeal. If Monticello is not a prevailing party, it is not a *losing* party. You cannot appeal from an order denying summary judgment and setting the case for further proceedings. One way or the other, then, Monticello's appeal is not properly before us. Farr's appeal is proper, however, under *Bankers Trust Co. v. Mallis*, 435 U.S. 381, 386, 98 S.Ct. 1117, 1121, 55 L.Ed.2d 357 (1978), which held that the parties may waive the "separate-judgment requirement where one has accidentally not been entered." Omission of language such as "and therefore the complaint is dismissed with prejudice, and the plaintiff shall take nothing by her suit" was accidental, and the parties have waived any entitlement to a complete Rule 58 judgment.

Farr's sole remaining federal claim—that Sachs violated the first amendment by initiating a reassessment of her home—belongs in the category "no harm, no foul." Farr and her husband began building a house in 1981. In 1982, when the structure was 50% complete, Llewellyn Imig, the Village's assessor, concluded that the land and building together were worth $50,200. Although construction progressed, the property was not reassessed. In 1987 the Village increased all assessments by 3%. In September 1989 Imig and Sachs discussed reassessment of all properties in the Village; during their meeting Emil Jensen, the Village's building inspector, mentioned that he recently had loaned some scaffolding to the Farrs so that they could complete the interior of their house. Imig then asked Mr. Farr for access to the interior so that he could reassess the property. Mr. Farr would not allow Imig inside; the assessed value remained at $51,700 (the $50,200 plus the 3% in 1987). Even if we assume that Sachs asked Imig to reassess the property (something both Imig and Sachs deny), nothing happened. Farr has not been penalized for exercising any federally protected right; no penalty is in prospect. If Sachs, piqued by the lawsuit, had muttered to himself "Boy, I'd like to sock 'er in the jaw!" and thrown a roundhouse right while standing two miles away, she could not collect damages on the theory that had he been 10,559 feet closer she would have been injured.

Moreover, it is difficult to see how an accurate assessment of property could "penalize" Farr for filing the suit. Ever since 1982 the house has been underassessed. Construction continued and market value rose, but assessed value did not. A contention that the Village assessed her property at a greater percentage of market value than other houses would be the foundation for a claim, but Farr has never argued that, if Imig had reassessed the property in 1989, the Farrs would have received an assessment out of step with their neighbors'. As Farr has not alleged that she was to be treated unfavorably compared with (a) her legal entitlements, or (b) the owners of other properties of similar market value, the complaint failed to state a claim on which relief may be granted. Cf. *Wayte v. United States*, 470 U.S. 598, 105 S.Ct. 1524, 84 L.Ed.2d 547 (1985).

Tortious interference with contract is the remaining claim founded on state law. Part IV.C of the district court's opinion holds that Farr, an employee at will, may not recover for wrongful discharge or tortious interference against the Village. Addressing the tortious interference claim, the court wrote: "[T]his cause of action fails as a matter of law as determined *supra* at IV.C." Farr correctly replies that

employment at will is a contract, so that it is possible for a third party (Gruber or Sachs) to interfere tortiously with the Farr-Village contract. *Pure Milk Products Cooperative v. National Farmers Organization*, 64 Wis.2d 241, 258, 219 N.W.2d 564 (1974); *Mendelson v. Blatz Brewing Co.*, 9 Wis.2d 487, 491, 101 N.W.2d 805 (1960); *Harman v. La Crosse Tribune*, 117 Wis.2d 448, 455, 344 N.W.2d 536 (App.1984); *Charolais Breeding Ranches v. FPC Securities Corp.*, 90 Wis.2d 97, 104, 279 N.W.2d 493 (App.1979). See also *Restatement (2d) of Torts* § 766 (1977). Gruber and Sachs charged Farr with improper conduct. It may be that their charges are privileged, but it is not possible to bypass that inquiry on the theory that an at-will employee has no protection in Wisconsin.

As we remarked in *Kumpf v. Steinhaus*, 779 F.2d 1323, 1325 (7th Cir.1985), the law of privilege in Wisconsin is less than clear. *Lorenz v. Dreske*, 62 Wis.2d 273, 287, 214 N.W.2d 753 (1974), the most recent case, says that one improper motive may defeat the privilege. On this record, there is a genuine dispute about the motives with which Gruber and Sachs initiated Farr's removal. Notwithstanding this, we conclude that Gruber and Sachs were privileged to act as they did—not because their motives were pure, but because they acted as elected political officials.

The premise of cases such as *Mendelson* and *Kumpf* is that there is a difference between personal and corporate disputes. Cf. *Visser v. Packer Engineering Associates, Inc.*, 924 F.2d 655, 657 (7th Cir.1991) (in banc). Corporate employees are supposed to advance the interest of the firm and not private interests that may conflict with investors' welfare. Grudges are among the agency costs of business, and threat of liability for interference with another employee's relations with the firm induces employees to give less weight to their private agendas.

In public life, however, the line between personal and official business is not so clear. Political officials routinely appoint their friends to office. Personal enemies are political ones too. Rewarding one's friends induces reciprocal loyalty, necessary to support campaigns for office and the administration of government after victory. In the corporate world money, the universal solvent, aligns the interests of agents and investors. Success leads to bonuses, the appreciation of stock, and like rewards. Governmental bodies do not give hefty bonuses for success; the Village of Howard does not have securities whose value will appreciate if the incumbents do well. It may not be possible to define "success" at all; the great difficulty of creating objective criteria is among the reasons why administration cannot be reduced to formula—why, in other words, there is politics. What in private life is a normal reward for success is in public life an unpardonable conflict of interest. A decrease in the power of financial incentives, and an increase in the difficulty of defining and measuring gains and losses, magnifies the role of friendship and loyalty. It is no accident that only in politics does the recipient of bad news kill the messenger.

How *do* you motivate supporters to undertake the arduous work of campaigns, when payment and promises of public contracts are ruled out? How *do* public officials ensure that their appointees will carry out their programs? Camaraderie counts. When loyalty becomes the coin, payments must run both ways. Presidents and mayors choose department heads from among the faithful—or those they believe will become faithful if given the chance. A personal falling out will not long endure without political consequences.

For a long time in American politics loyalty and support affected every job the government had to offer: "To the victor belong the spoils." *Elrod v. Burns*, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976), changed all that but does not prevent elected officials from using political criteria to choose more sensitive posts. If it is tortious in Wisconsin to take personalities into account when making senior appointments, tortious for elected officials to sack those in whom they lack confidence—to equate personal and political enmity—we would have expected a court to say so long before now. But so far as we can tell no

case in Wisconsin (or any other state) mulcts an elected official for removing a personal nemesis from the payroll. Wisconsin does, however, recognize a privilege for elected officials acting in their public capacity, as the board of trustees acted when voting to remove Farr. See Wis.Stat. § 893.80(4), conferring immunity on "any ... political corporation, governmental subdivision or any agency thereof ... or ... its officers, officials, agents or employes for acts done in the exercise of legislative, quasi-legislative, judicial or quasi-judicial functions." This statutory privilege, unlike the common law privilege for discretionary public acts recognized in *C.L. v. Olson*, 143 Wis.2d 701, 422 N.W.2d 614 (1988), is not defeated by the possibility that the acts were malicious.

The *Restatement's* list of considerations in determining privileges includes "the social interests in protecting the freedom of action of the actor". *Restatement (2d) of Torts* § 767(e). Protecting the freedom of legislators to carry out (their conception of) the public's business ranks high on that list, so much so that members of Congress possess the only absolute immunity of constitutional magnitude. If there were a yardstick for the public welfare, a court might measure a village trustee's conduct against it and decide whether the justification came up short. Until the day the National Bureau of Standards creates a system of political weights and measures, voters and not judges must administer the penalty for giving excessive weight to personalities in politics. We are confident that the law of Wisconsin does not expose elected officeholders to liability in tort for turning their antagonists out of office.

Monticello's appeal, No. 91–1016, is dismissed for want of jurisdiction. On Farr's appeal the judgment is affirmed.