**James WALSH, Plaintiff–Appellant,**

v.

**Pat WARD and Thomas Oseland, Defendants–Appellees.**

No. 92–1680.

United States Court of Appeals, Seventh Circuit.

Argued March 3, 1993.

Decided April 28, 1993.

James P. Baker (argued), Springfield, IL, for plaintiff-appellant.

Jill Leka (argued), and Gary S. Rapaport, Springfield, IL, for defendants-appellees.

Before POSNER and EASTERBROOK, Circuit Judges, and PELL, Senior Circuit Judge.

---

* The Honorable Frank A. Kaufman, Senior District Judge for the District of Maryland, sitting by designation, was a member of the original panel but took no part in the vote on the suggestion for rehearing *en banc.*

EASTERBROOK, Circuit Judge.

On being promoted to battalion chief, the highest civil service position in the Springfield, Illinois, fire department, James Walsh received what many would consider a plum appointment: directing the training of other firefighters during normal business hours. Until this promotion, Walsh had been a captain of an engine company, with 24 hours on duty followed by 48 hours off. His new position paid more and had shorter, regular hours. Walsh nonetheless filed this suit, contending that the assignment violated his rights under the Constitution of the United States.

Walsh's complaint asserts that he conducted a business during the 48-hour gaps between turns at the fire station. Until the union secured him the right to return to his old hours, Walsh had to give up this business in order to train firefighters. During the year he worked every weekday, he lost more from his private endeavors than he received in additional salary. Now the Constitution does not create a right to moonlighting; public agencies may insist on the full-time services of their employees. Walsh concedes as much. His case is special, he contends, because his superiors assigned him the 9–5 post in retribution for his speech while allowing other firefighters to hold second jobs. According to the complaint, "for many years [Walsh] has openly expressed his opinions with respect to the manner in which [defendant Pat Ward] performed his role as the Director of the Department of Public Safety and, from time to time, was critical of certain policies and views adopted" by Ward. Ward and Thomas Oseland, the Fire Chief, changed his work schedule in order to get back at him for criticizing Ward. Walsh concedes that the training job was appropriate work for a battalion chief and that his on-the-job perquisites and satisfactions were unaffected by the assignment. His sole contention is that public agencies may not consider an employee's speech when making assignments that affect other sources of income.

The district court dismissed the complaint under Fed.R.Civ.P. 12(b)(6), holding that defendants are immune from liability in damages. 757 F.Supp. 959. (Walsh, back on 24–hour shifts, does not seek an injunction or damages from the municipality.) In assigning Walsh to a new position after his promotion in 1988, the district court held, the defendants did not violate any clearly established constitutional right. See *Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). Walsh disputes this assessment, pointing out that in 1979 we held that "a job transfer, in contrast to a discharge, could be the subject of a first amendment challenge." *Egger v. Phillips*, 710 F.2d 292, 324 (7th Cir.1983) (in banc) (Cudahy, J., concurring), citing *McGill v. Board of Education*, 602 F.2d 774, 780 (7th Cir.1979). Defendants concede that *McGill* applies the approach of *Pickering v. Board of Education*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), and other first amendment cases, to transfers at no loss of pay, but reply that Walsh was not "transferred." He was promoted—at his own request, albeit not to the position of his choosing. To this day we have not applied *Pickering, McGill,* and similar cases to promotions, initial assignments, and the like, all of which means, defendants insist, that it was not "clearly established" in 1988 that they were forbidden to consider an employee's speech when matching battalion chiefs with positions.

*McGill* recognizes a proposition that cannot be denied: an employer can penalize past speech and discourage future speech by assigning a worker to an undesirable job. Dissenters exiled to Siberia (or the equivalents found within many bureaucracies) quickly get the message, even though the new postings carry the same salary and title. Supervisors control many sources of satisfactions, from the cleanliness of the workplace to the allocation of parking spaces. Rewards and penalties are most visible to judges when stated in monetary terms—say, supporters receive 20% more than critics—but incentives are no less effective when they are subtle. A campaign of petty harassment may achieve the same effect as an explicit punishment. *Pieczynski v. Duffy*, 875 F.2d 1331 (7th Cir.1989); *Bart v. Telford*, 677 F.2d 622 (7th Cir. 1982).

Still, *Pickering* does not hold that the first amendment creates a remedy for every official action that responds in some way to an employee's speech. Instead it establishes a balancing approach: public

employers may penalize speech that is excessively disruptive, or concerns the employee's private business, unless that penalty is excessively burdensome to the public interest in free speech. E.g., *Brown v. Glines,* 444 U.S. 348, 100 S.Ct. 594, 62 L.Ed.2d 540 (1980); *Connick v. Myers,* 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983); *Rankin v. McPherson,* 483 U.S. 378, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987). Any balancing approach is hard to administer and invites consideration of many factors. Among these are the costs of administering the judicial system. Litigation is expensive and, alas, prone to error. The farther we depart from bright line rules, the more common error becomes. Have defendants gone "too far"? Questions of degree cannot be answered reliably, which means that taking *any* action is risky to a potential defendant.

Once courts begin to use a sliding scale—posing questions that lack right, or at least obviously right, answers—it becomes correspondingly important to insist, before exacting damages from public officials who step over the line, that the line between the permitted and the forbidden have been marked in advance. Public officials do not receive rewards proportioned to their success, which makes management of a civil service system difficult. Employees can use their procedural and substantive rights to resist discipline or reassignment; supervisors who receive no rewards for improving the efficiency of their agencies may respond with a live-and-let-live approach. Little wonder that some bureaucracies become havens to slothful and inept workers. When the staff can lash back at the supervisors with actions for damages, the problem becomes worse. Cf. *Wyatt v. Cole,* —— U.S. ——, 112 S.Ct. 1827, 1833–34, 118 L.Ed.2d 504 (1992). An employee with a threat to collect damages from a supervisor who assigns him to a post he does not want—a threat made credible by the plastic nature of "balancing" approaches, which gives most suits some positive settlement value—is in a good position to bring the civil service system to its knees. If the first amendment clearly forbids the supervisors' acts, the cost is worth bearing (and also is diminished, by the very clarity of the rule). In the main, however, the rules must be firmly established before they can be enforced by damages taxed against the supervisors' personal wealth.

"The contours of the right must be sufficiently clear that a reasonable official would understand that *what he is doing* violates that right." *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987) (emphasis added).

Balancing approaches make disagreement inevitable.... [S]ome judges will rely on the qualitative aspects of the earlier cases (the interest in free speech), while others will emphasize the quantitative aspects (treating the early cases as showing only that there ought not be an "excessive" price tag attached to expression).... Where the line eventually will be drawn is not predictable at the beginning. Indeed, lines of this kind are unstable; a change in Justices' attitudes about the importance of the speakers' interests and those of the government may produce different outcomes.

Principles of immunity relieve [public employees] from having to decide, at their financial peril, how judges will balance these interests in the years to come. Governmental employees must obey the law in force at the time but need not predict its evolution, need not know that in the fight between broad and narrow readings of a precedent the broad reading will become ascendant.

*Greenberg v. Kmetko,* 922 F.2d 382, 385 (7th Cir.1991).

Would careful supervisors have understood in 1988 that assigning a newly promoted worker to a 9–5 job could violate the Constitution because of its effect on earnings from a business that worker operated on the side? Walsh has been unable to find a single case before 1988 (or since, for that matter) applying *Pickering* to decisions that affect income from second jobs. Our own search has been equally fruitless. There are plenty of cases like *McGill,* involving a transfer to a job less desirable on its own terms—perhaps because it was more dangerous, or boring, or had less potential for advancement, or was so unsuited to the worker's skills that it amounted to constructive discharge, or even because it was harder to get to. See 602 F.2d at 780 and, among pre–1988 cases in other

circuits, *Reeves v. Claiborne County Board of Education,* 828 F.2d 1096 (5th Cir.1987); *Clark v. Yosemite Community College District,* 785 F.2d 781, 790 (9th Cir.1986); *Bowman v. Pulaski County Special School District,* 723 F.2d 640 (8th Cir.1983); *Childers v. Independent School District,* 676 F.2d 1338 (10th Cir.1982); *Alicea Rosado v. Garcia Santiago,* 562 F.2d 114 (1st Cir.1977). None holds that the first amendment compels supervisors to assign positions so as to avoid curtailing an employee's opportunities for earnings from other employment.

The law is not uniform even concerning the limits of supervisors' ability to affect the satisfactions offered by the public job. For example, *Dorsett v. Board of Trustees,* 940 F.2d 121 (5th Cir.1991), holds that supervisors may change a teacher's assignments and withhold pay increases on account of speech the court assumed related to matters of public concern. Shortly after Ward and Oseland assigned Walsh to train other firefighters we held that a parallel first amendment doctrine established by *Elrod v. Burns,* 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976), does not prevent public agencies from taking a worker's politics into account when making (or failing to make) promotions and job assignments, unless the assignment amounts to constructive discharge. *Rutan v. Republican Party of Illinois,* 868 F.2d 943, 953–54 (7th Cir.1989) (in banc). Our opinion in *Rutan* observes that reductions in salary and the intangible satisfactions furnished by the job have less potential to affect speech than discharge would, and that sound reasons counsel limiting judicial control of public employment to the most serious forms of deprivation. Dividing five to four, the Supreme Court reversed that opinion, 497 U.S. 62, 110 S.Ct. 2729, 111 L.Ed.2d 52 (1990), but the reversal came two years after Walsh was assigned to training. The close division on the Supreme Court implies that even today one can not say with confidence how far judges must supervise the employment relation in order to root out all reactions to employees' speech. Cf. *Farr v. Gruber,* 950 F.2d 399 (7th Cir.1991).

Reasonable supervisors acting in 1988 would not have understood that the law "clearly established" that a promotion to a suitable job can nonetheless violate the Constitution when it diminishes an employee's opportunity to make money elsewhere. Ward and Oseland accordingly are immune to liability in damages.

AFFIRMED.

PELL, Senior Circuit Judge, dissenting.

James Walsh has been a firefighter for the city of Springfield, Illinois since 1972. In October, 1988, upon attaining the highest score on a civil service examination, Walsh became entitled to a promotion to battalion chief—a promotion over which the defendants, incidentally, had no authority. Walsh claims that the defendants took advantage of this promotion to reassign him from an engine company to a training position for which he had no experience and no particular aptitude, and that they did so despite the availability of battalion chief jobs more suitable for his abilities. Walsh further claims that the defendants reassigned him in retaliation for his open criticism of the Director of the Department of Public Safety in order to deprive Walsh of his former work schedule, and hence the ability to pursue his outside business interests. Because of my opinion that the defendants were sufficiently *"on notice* that their actions violated clearly established law," *Rakovich v. Wade,* 850 F.2d 1180, 1211 (7th Cir.) (*en banc* ) (emphasis in original), *cert. denied,* 488 U.S. 968, 109 S.Ct. 497, 102 L.Ed.2d 534 (1988), I respectfully dissent.

There is, of course, little disagreement concerning the basic principles of qualified immunity analysis. Qualified immunity entitles government officials performing discretionary functions to immunity from suit "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982); *see Siegert v. Gilley,* —— U.S. ——, ——–——, 111 S.Ct. 1789, 1793–94, 114 L.Ed.2d 277 (1991); *Mitchell v. Forsyth,* 472 U.S. 511, 526, 105 S.Ct. 2806, 2815, 86 L.Ed.2d 411 (1985). In order for a right to be "clearly established," it must be sufficiently particular-

ized to put defendants on notice that their actions probably violate that right. *Powers v. Lightner*, 820 F.2d 818, 821 (7th Cir.1987) (divided panel) (quoting *Azeez v. Fairman*, 795 F.2d 1296, 1301 (7th Cir. 1986)), *cert. denied*, 484 U.S. 1078, 108 S.Ct. 1057, 98 L.Ed.2d 1019 (1988). As the Supreme Court has stated,

> [t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in light of pre-existing law the unlawfulness must be apparent.

*Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987) (internal citation omitted); *accord Marshall v. Allen*, 984 F.2d 787, 794 (7th Cir. 1993); *Gorman v. Robinson*, 977 F.2d 350, 354 (7th Cir.1992); *Rakovich*, 850 F.2d at 1208.

Thus, the right Walsh invokes must be clearly established in light of the particular facts confronting the defendants when they acted. It is not, however, necessary that the right be defined with such precision that guiding legal principles can rarely, if ever, be found in prior case law. *See Rakovich*, 850 F.2d at 1211; *LeClair v. Hart*, 800 F.2d 692, 695–96 (7th Cir.1986). With these precepts in mind, the issue before us is whether it was sufficiently clear in October of 1988 that the defendants could not transfer Walsh to a less desirable position on a less desirable shift in retaliation for Walsh's exercise of his First Amendment rights. Contrary to the majority's assertion, Walsh has claimed that the defendants assigned him to a job which was less desirable on its own terms than the one he previously held. Walsh also claimed that by transferring him to a position requiring a straight 40–hour shift, defendants altered the conditions of his employment in a way which caused him to suffer a loss of income by interfering with his ability to pursue outside business interests. Walsh further claimed that defendants did this despite the prevailing custom that the most senior person on an eligibility roster be given first choice of shift assignments, and that he was thus deprived of an important benefit normally associated with his position. I believe that it was quite clear to the defendants that their actions constituted impermissible interference with Walsh's freedom of speech.

Since 1979, it has been clearly established in this Circuit that an unwanted transfer entailing some tangible deprivation, if brought about in retaliation for constitutionally protected speech, is illegal. *McGill v. Board of Education*, 602 F.2d 774, 779–80 (7th Cir.1979). The transfer need not involve a "loss of pay, seniority or other rights," *id.* at 780, although it must generally involve some "adverse action ... likely to chill the exercise of constitutionally protected speech." *Id.* (citing *Pickering v. Board of Education*, 391 U.S. 563, 574, 88 S.Ct. 1731, 1737, 20 L.Ed.2d 811 (1968)); *see also Yoggerst v. Stewart*, 623 F.2d 35, 37, 39 (7th Cir.1980) (written reprimand may be illegal if likely to chill speech).

Thus, a transfer to a position which is intrinsically less desirable, such as one from an engine company to a training position for which an employee had no previous experience, may be actionable. *Cf. McGill*, 602 F.2d at 780 (teacher transferred to "less desirable" school in retaliation for protected speech). Furthermore, where an employee claims that contrary to the usual practice, he was denied his choice of shift assignments and instead was required to work a new schedule which constituted a major change in working conditions and caused him tangible harm, I am of the opinion that he states a claim for relief. *See Perry v. Sindermann*, 408 U.S. 593, 597, 92 S.Ct. 2694, 2697, 33 L.Ed.2d 570 (1972) (government may not deny a valuable benefit to a person on a basis that infringes upon his freedom of speech); *Bart v. Telford*, 677 F.2d 622, 625 (7th Cir.1982) (petty harassment and selective enforcement of work rules may be actionable); *Pieczynski v. Duffy*, 875 F.2d 1331, 1335–36 (7th Cir.1989) (same); *see also Click v. Copeland*, 970 F.2d 106, 109–11 (5th Cir.1992); *Hyland v. Wonder*, 972 F.2d 1129, 1134–35 (9th Cir.1992), *petition for cert. filed*, 61 U.S.L.W. 3653 (U.S. Mar. 10, 1993) (No. 92–1478); *Childers v. Inde-*

*pendent School Dist. No. 1*, 676 F.2d 1338, 1341–42 (10th Cir.1982). In light of these cases, I am led to conclude that at the time the defendants acted, the law was sufficiently clear that Walsh's reassignment was illegal, thus precluding dismissal of this case on the basis of qualified immunity. *See Bart*, 677 F.2d at 625.

This Court has previously recognized that certain municipal employees such as firefighters and police officers frequently work shifts which provide them with long periods when they are off-duty, and that these schedules are considered a highly desirable benefit by the employees who have them. *See F.O.P. Lodge No. 121 v. City of Hobart*, 864 F.2d 551, 553–56 (7th Cir.1988). In the present case, we see that Walsh's union fought for and ultimately won his return to his prior schedule. I am therefore particularly concerned that the Court's decision today not leave firefighters, police officers, and other municipal employees whose jobs entail relatively unusual conditions of employment with less protection of their First Amendment right to speak freely on matters of public concern than is afforded to employees whose jobs provide them with more conventional benefits.

I must respectfully disagree with the majority's demeaning characterization of a firefighter's holding another job during the 48 hours off duty as "moonlighting." A firefighter is employed in a high risk job, often of considerable danger to survival. The 24 hours on duty is the equivalent of three regular eight-hour shifts back-to-back. What the firefighter does during his 48 hours off time has no relation to his regular job, as moonlighting or otherwise. The relief of the 48 hours off undoubtedly makes the job, with its inherent danger, more palatable.

Moonlighting conveys its own meaning, referring in that sense to "after dark work," or, as it has come to be used in today's job market, as an extra job performed ordinarily in the evening after the regular job has been finished earlier in the day. It should not be applied to time which, in the case of firefighters, has been earned as off time during which the firefighter can do as he pleases.

Scheduling the hours of work at a fire station bears no resemblance to doing so for a retail store or a manufacturing factory. In those employment situations the hours of work may be scheduled on a regular daily basis. Catastrophic fires are no respecters of time or place. Their happening is not subject to prediction. Consequently, the station has to have a full complement of employees 24 hours a day. This could be accomplished, of course, with one shift from 8 a.m. to 4 p.m., one shift from 4 p.m. to midnight, and another shift from midnight to 8 a.m. The other alternative, one adopted by Springfield and, in my opinion, probably by many other cities, is to have all firefighters do a full 24 hours of work, taking whatever may come, to be followed by 48 hours of their own time to do with as they please.

I have little doubt that if Walsh were allowed to proceed with the proof of his case, he could show that not only in Springfield but elsewhere, in many cities in this country, the firefighter's schedule of 24 hours on and 48 hours off is a well-recognized, common practice, and that it is equally a well-recognized and common practice that firefighters supplement their income during this off period by other gainful employment. I personally am aware of two other cities where the same practice is followed.

This income-supplementing work does not interfere with regular duty, which is encompassed in the three eight-hour continuous duty shifts. In the present case, in the words of the majority, the public agency has secured "the full-time services of their employees" when these employees have worked the scheduled continuous 24 hours of duty once each three days.

As the majority also points out, Walsh's position is that the defendants "changed his work schedule in order to get back at him for criticizing Ward." Elsewhere, the majority opinion refers to the change applicable to Walsh as one that "many would consider a plum appointment." Leaving aside the fact that the "plum" carried with it a lessening of his weekly income, if Walsh were permitted to proceed with his case, a trier of fact might have no difficul-

ty in reaching the conclusion that the defendants were accomplishing what Walsh says was their purpose, by giving him a "plum" position which might well constrain him from taking action against them, and which simultaneously penalizes him for his exercise of freedom of speech.

When we require a plaintiff to prove that he has been deprived of a clearly established right by citing cases that are closely analogous to his own, an employee who has been deprived of a more widely-recognized benefit has a much easier burden to carry, since the deprivation he has suffered is more likely to be acknowledged as a violation of a right that has been clearly established. In a case where it appears that under governing law, the right at issue would indeed be clear to the minds of reasonable defendants, it seems to me to be both unnecessary and inappropriate to insist that the plaintiff bring forward cases involving facts that are nearly identical to the facts of his own case.

I think Judge Ripple's dissent in *Rakovich*, 850 F.2d at 1217, while it did not prevail there, points up with particular pertinence here the problem inherent in requiring identical facts:

> The court's approach to the need for "closely analogous" case law sends a clear message to those officials, hopefully small in number, who are willing to use their power to inhibit freedom of speech: Choose a novel approach to your abuse of power. Avoid a *modus operandi* that someone has tried before. Create a verbal smokescreen by articulating fabricated justifications for your actions. Then, when you are sued, point to the fact that there has never been a case like yours.

It appears that Judge Ripple's prediction is now a *fait accompli*.

The majority's approach in this case may leave public employees such as Walsh particularly vulnerable to retaliation for the exercise of their First Amendment rights. I am certain that the majority does not intend this result, believing as it does that reasonable officials in 1988 could not have known that their actions violated Walsh's rights. I disagree with the latter proposi-

tion, and for that reason I respectfully dissent.