In the

# United States Court of Appeals
## For the Seventh Circuit

No. 01-4074

MARK E. THOMPSON,

*Plaintiff-Appellant*,

*v.*

ILLINOIS DEPARTMENT OF PROFESSIONAL REGULATION,
LEONARD A. SHERMAN, individually and as Director
of the Illinois Department of Professional Regulation,
BOB DUDYCZ, WALTER DUDYCZ, and WILLIAM DARR,

*Defendants-Appellees*.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 01 C 6057—**Suzanne B. Conlon**, *Judge*.

ARGUED MAY 23, 2002—DECIDED AUGUST 7, 2002

Before FLAUM, *Chief Judge*, BAUER and ROVNER, *Circuit Judges*.

BAUER, *Circuit Judge*. This case deals with the long-running saga of political patronage hiring and firing in Illinois. *See Elrod v. Burns*, 427 U.S. 347 (1976) (plurality opinion); *Rutan v. Republican Party of Ill.*, 497 U.S. 62 (1990); *O'Hare Truck Service, Inc. v. City of Northlake*, 518 U.S. 712 (1996); *see also Shakman v. Democratic Org. of Cook County*, 569 F.Supp. 177 (N.D. Ill. 1983).

The plaintiff, Mark E. Thompson, an elected Maine Township Supervisor, sued the Illinois Department of

Professional Regulation (IDPR) and others, claiming he was demoted and transferred from his position as Chief Administrative Law Judge (Chief ALJ) for exercising his First Amendment rights of political belief and association. The district court dismissed the suit, finding the position was a policymaking one based on the document describing the position attached to Thompson's complaint. Thompson appeals, arguing the position is not a policymaking one, and that the district court misused and misconstrued the attached document. Finding that Thompson pled himself out of court, we affirm.

## BACKGROUND

Mark E. Thompson was an elected Maine Township Supervisor from 1993 to 2001. In 1999 he was appointed, on a probationary basis, Deputy Chief Counsel for the IDPR.[1] Thompson later accepted a voluntary transfer to the position of Chief ALJ of the IDPR in April 2000.[2]

In October 2000, Thompson fired a Maine Township Code Enforcement Officer, citing the employee for failing to come to work and spending most of his time at home (a.k.a. ghost pay rolling). According to Thompson, the fired employee was a friend of defendants Bob Dudycz and

---

[1]  The record does not reflect how Thompson obtained this position, but the defendants claim the original position was *Rutan* exempt—something Thompson does not comment upon—and infer that he was appointed based on his political affiliation. At the time of the original appointment Thompson was a Republican and the Governor of Illinois was also a Republican.

[2]  While Thompson has argued he was entitled to the position of Chief ALJ—despite the fact he was initially appointed to another position—he acknowledges that his transfer to the position of Chief ALJ "for the duration of his appointment" was based only on a "[mutual understanding]".

William Darr. Bob Dudycz challenged Thompson for the position of Maine Township Supervisor in 2001,[3] William Darr was the Maine Township Republican Committeeman,[4] and Walter Dudycz was an elected State Senator. (Bob Dudycz and Walter Dudycz are brothers).

Tensions began to mount between Thompson and Dudycz and Darr. As a result, Thompson was not "slated" as a candidate for Maine Township Supervisor on the Republican ticket. Then, in January 2001, Thompson, a Republican, began openly supporting several Democratic candidates for Maine Township offices. Thompson alleges that thereafter Bob Dudycz, Walter Dudycz, and William Darr conspired with other Illinois State elected officials, including the Governor, to demote and transfer him in retaliation for his actions as Township Supervisor and his political associations.

Thompson, a resident of Des Plaines, was later temporarily transferred to Springfield to occupy the position of IDPR's Chief of Enforcement Administration. Finally, Thompson was transferred back to his original position as IDPR's Deputy Chief Counsel, assigned to work in Chicago.

Thompson filed a two count complaint in district court on August 7, 2001. He amended the complaint, adding an additional count, on September 20, 2001. Count I of the amended complaint alleged that Thompson was trans-

---

[3] Bob Dudycz, an elected Maine Township Supervisor, also holds an unelected position in state government in the Illinois Department of Central Management Services.

[4] William Darr, a Maine Township Republican Committeeman, also holds an unelected position as Commissioner of the Illinois Office of Banks and Real Estate. The position appears to have some political antecedents as Darr was appointed by the Governor.

ferred and later removed from his position as Chief ALJ in retaliation for exercising his First Amendment free speech rights in violation of 42 U.S.C. § 1983. The employment actions were purported to be politically motivated. Count II was a state law breach of contract claim. Count III was a claim for denial of due process and equal protection for the transfer and removal. Thompson attached the official job description of the Chief ALJ to the amended complaint.

The defendants moved to dismiss the complaint under Fed. R. Civ. P. 12(b)(6), and the district court granted the motion, finding, as a matter of law, that the ALJ position occupied by the plaintiff was a policymaking position, hence he could be removed for political reasons. In reaching that conclusion, the district court relied wholly upon the job description of the Chief ALJ provided by Thompson. The court also found Director Sherman was entitled to qualified immunity. Thompson appeals the dismissal of Counts I and III, and the denial of his motion for leave to file a third amended complaint.

## ANALYSIS

### A.  *Standard of Review*

We review the district court's grant of a motion to dismiss *de novo*, looking only at the pleadings, taking all the facts pled as true and construing all inferences in favor of the plaintiff. *Beam v. IPCO Corp.*, 838 F.2d 242, 244 (7th Cir. 1988); *Pleva v. Norquist*, 195 F.3d 905, 991 (7th Cir. 1999). The consideration of a 12(b)(6) motion is restricted solely to the pleadings, which consist generally of the complaint, any exhibits attached thereto, and supporting briefs. *See Beam*, 838 F.2d at 244; FED. R. CIV. P. 10(c) ("A copy of any written instrument which is an exhibit to a pleading is a part thereof for all purposes."). Any further pleadings would turn the motion into a 12(c)

motion for judgment on the pleadings, or if additional evidence was relied upon or introduced, the motion would be converted into a 56(c) motion for summary judgment. *See Beam*, 838 F.2d at 244; *Dempsey v. Atchison, Topeka and Santa Fe Ry. Co.*, 16 F.3d 832, 835-36 (7th Cir. 1994).

### B. *Pleading Requirements*

All that Federal Rule of Civil Procedure 8 requires is a short and plain statement showing the plaintiff is entitled to relief, the purpose of which is to give the defendant notice of the claims and the grounds they rest upon. *See Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit*, 507 U.S. 163 (1993). If the plaintiff chooses to provide additional facts, beyond the short and plain statement requirement, the plaintiff cannot prevent the defense from suggesting that those same facts demonstrate the plaintiff is not entitled to relief. *See Jefferson v. Ambroz*, 90 F.3d 1291, 1296 (7th Cir. 1996) ("[I]f a plaintiff chooses to 'plead particulars, and they show he has no claim, then he is out of luck—he has pleaded himself out of court.'") (quoting *Thomas v. Farley*, 31 F.3d 557, 558-59 (7th Cir. 1994)); *cf. R.J.R. Serv., Inc. v. Aetna Cas. and Sur. Co.*, 895 F.2d 279, 280 (7th Cir. 1989) (holding a court is "not obliged to ignore any facts set forth in the complaint that undermine the plaintiff's claim or assign any weight to unsupported conclusions of law."). Likewise, Thompson cannot attach a description of the duties of the Chief ALJ, affirming that those were his duties, and later, after realizing the consequences, attempt to retract the exhibit.

Thompson asserts he is entitled to rebut the statements in the exhibit, and that the 12(b)(6) motion should have

been converted into a Rule 56(c) motion.[5] Thompson's argument might have some validity if any of the defendants had introduced the document; the problem is that it was Thompson who introduced the exhibit which harmed, instead of helping his case. Rule 56(c) is not a savior for plaintiffs whose pleadings essentially build the defendant's case. The district court properly considered this as a motion to dismiss by relying only on the pleadings and not considering any documents outside the pleadings.

## C. *Documents Attached to the Complaint as Evidence*

Thompson cites *Northern Indiana Gun & Outdoor Shows, Inc. v. City of South Bend*, 163 F.3d 449 (7th Cir. 1998), in support of his argument that when attachments and allegations in a complaint are in conflict, the court should resolve the differences in favor of the plaintiff. *NIGOS* reaffirmed the "well-settled rule that when a written instrument contradicts allegations in a complaint to which it is attached, *the exhibit trumps the allegations.*" *Id.* at 454 (emphasis added); *see also In the Matter of Wade*, 969 F.2d 241, 249 (7th Cir. 1992) ("A plaintiff may plead himself out of court by attaching documents to the complaint that indicate that he or she is not entitled to judgment."); *Graue Mill Dev. Corp. v. Colonial Bank & Trust Co. of Chi.*, 927 F.2d 988, 991 (7th Cir. 1991). *NIGOS'* specific holding dealt only with exhibits which are not the "subject of the claim". 163 F.3d at 455. *NIGOS* applied a more flexible approach because the attached exhibit

---

[5] Even though Thompson argued for the opportunity to contradict the facts contained in the exhibit, he openly stated that his real issue was not with the validity of the document, but with the inferences drawn from it by the district court. *See* Brief of Plaintiff-Appellant at 15, 17.

was not at issue in the litigation. *Id*. The fact remains that where a plaintiff attaches documents and relies upon the documents to form the basis for a claim or part of a claim, dismissal is appropriate if the document negates the claim.

In his second amended complaint, which is twelve pages long, Thompson did not provide a single direct reference to the duties of the Chief ALJ. The only statement which even refers to the Chief ALJ's duties is in Count II, the breach of contract claim, and states: "That the position of Chief Administrative Law Judge is a civil service title of Senior Public Administrator. (Job description is attached as Exhibit C)". The lack of contradictory facts in the complaint distinguishes the instant case from *NIGOS* and from cases in which the facts of the complaint are in conflict with facts in an exhibit attached to the complaint. Rather than making allegations in the complaint, Thompson attached the job description as proof that he was demoted when he was transferred. (In order to show that he was demoted and transferred, Thompson needed to establish that the duties of the two positions were different, which is why he also attached the job description for Chief of Enforcement Administration). In this case, the exhibit was attached for the purpose of describing the Chief ALJ's duties, clearly making it part of the "subject of the claim", and no contrary facts were alleged in the actual complaint. That leaves us with the exhibit as the sole uncontradicted description of the duties of the Chief ALJ.

D. *Count I: First Amendment Claim*

The freedom to associate with persons of like mind and opinion, and believe in a particular cause or idea are among the core rights protected by the First Amendment. *See*, *e.g.*, *Elrod*, 427 U.S. at 356; *Buckley v. Valeo*, 424 U.S. 1, 11 (1976). Government cannot condition employment on be-

lief or adherence to a particular idea or political party any more than it can condition a benefit on the same. *See Keyishaian v. Bd. of Regents of the Univ. of the State of New York*, 385 U.S. 589 (1967); *Perry v. Sindermann*, 408 U.S. 593, 597 (1972); *Elrod*, 427 U.S. at 358-60; *Branti v. Finkel*, 445 U.S. 507, 513-17 (1980); *Rutan*, 497 U.S. at 69-27 (extending the prohibition on conditioning employment on political belief or adherence to "promotion, transfer, recall, and hiring decisions"). Such conditions are antithetical to our democratic republic, and, moreover, prevent government from operating in an efficient and beneficial manner. *See Elrod*, 427 U.S. at 358 ("Patronage can result in the entrenchment of one or a few parties to the exclusion of others."); *Branti*, 445 U.S. at 517 n.12 ("Government funds, which are collected from taxpayers of all parties on a nonpolitical basis cannot be expended for the benefit of one political party simply because that party has control of the government.").

A representative democracy is based on competition (between candidates and ideas and not necessarily parties); and structural entrenchment through the spoils system would prevent serious challenges to incumbents and the formulation of new ideas. *See Rutan*, 497 U.S. at 81-86 (Stevens, J., concurring) (noting that the founding fathers—Madison, Hamilton, Franklin, Washington, and John Adams—all decried the divisive effect of political parties). And unlike other forms of government, a representative democracy continually reinvents and reinvigorates itself with new people and new ideas preventing stagnation, decay, and eventual collapse. *See generally* JOHN STUART MILL, CONSIDERATIONS ON REPRESENTATIVE GOVERNMENT (1860); ALEXIS DE TOCQUEVILLE, DEMOCRACY IN AMERICA (Vol. I, 1835 and Vol. II, 1840).

However, political leaders are, at least in theory, elected for a purpose, *i.e.*, to carry out the promises and pledges made during the campaign. To prevent a newly elected offi-

cial from carrying out his or her purpose would similarly be in contradiction to democratic traditions. *See Elrod*, 427 U.S. at 372 ("There is also a need to insure that policies which the electorate has sanctioned are effectively implemented."); *Branti*, 445 U.S. at 517 n.12 ("The plurality emphasized that patronage dismissals could be justified only if they advanced a *governmental* rather than a *partisan* interest.") (emphasis added). Thus, the First Amendment does not categorically limit the ability of elected leaders from surrounding themselves with loyal, like-minded subordinates. *Elrod*, 427 U.S. at 367-73. If a public employer can demonstrate a compelling reason for a dismissal based on political affiliation, then the removal may be constitutionally justified. *See id*. at 360; *Milazzo v. O'Connell* (*Milazzo I*), 108 F.3d 129, 131 (7th Cir. 1997).

   The justification often proffered by public employers in terminating their subordinates is that such positions were "policymaking" in nature, requiring political loyalty or confidentiality to effectively discharge required duties. *See Branti*, 445 U.S. at 517-18. The term "policymaker" is somewhat misleading because not all public employees who make policy can be dismissed for political reasons, just as there is no absolute prohibition against the political dismissal of any public employee who is not a "policymaker". *See id*. at 517-19; *Rutan*, 497 U.S. at 71 n.5; *Pleva*, 195 F.3d at 911-12. "[T]he ultimate inquiry is not whether the label 'policymaker' or 'confidential' fits a particular position; rather the question is whether the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved." *Branti*, 445 U.S. at 517-18; *Rutan*, 497 U.S. at 71 n.5. Nevertheless, we begin our analysis looking for policymaking powers or confidential relationships because those terms "accurately describe the vast majority of offices that fall within the realm of legitimate

patronage". *Meeks v. Grimes*, 779 F.2d 417, 420 (7th Cir. 1985). We keep in mind the fact that the defendant bears the burden of establishing the position is a confidential or policymaking position which would justify politically motivated employment actions. *E.g.*, *Milazzo I*, 108 F.3d at 132.

In determining whether an employee is in a policymaking position we consider, among other things, "whether the employee acts as an adviser or formulates plans for the implementation of broad goals." *Elrod*, 427 U.S. at 367-68; *Branti*, 445 U.S. at 518. Job title and supervisory authority do not necessarily transform an employee into a policymaker because the employee "may have only limited and well-defined objectives". *Elrod*, 427 U.S. at 367-68; *see also Milazzo I*, 108 F.3d at 133 n.1 (citing cases showing that "merely being a supervisor/administrator is not sufficient to show that political affiliation is an appropriate requirement for the job in question."). On the other hand, a lower level employee may have more actual responsibility by virtue of poorly defined duties of a "broad scope". *Elrod*, 427 U.S. at 367-68. Hence, lists of duties and terms of office figure into the calculation, but do not determine whether or not the position is a policymaking one. Rather, we look at the nature of the responsibilities and focus on the duties inherent in an office, and not the functions of the position performed by a particular person.

Thompson compares the facts in *Lohorn v. Michal*, 913 F.2d 327, 329-30 (7th Cir. 1990), involving a statutorily labeled position, to the current situation, arguing the Illinois Department of Central Management Services (IDCMS) job description deserves little or no evidentiary weight. *Lohorn* involved only the statutory labeling of the position as "policymaking" without any description of the duties. *Id.* at 334-35. Our opinion concluded that the district court placed undue emphasis on the

mere label of the position as a "policymaking" one, and reaffirmed the principle that courts must "scrutinize the government's proffered justifications for impairing these first amendment interests." *Id.* at 334; *see also Meeks*, 779 F.2d at 420-21 n.2; *Shakman v. Democratic Org. of Cook County*, 722 F.2d 1307, 1310 (7th Cir. 1983) (per curiam). However, we also noted that the legislature's description of the position is ordinarily "entitled to great weight." *Lohorn*, 913 F.2d at 334-35 ("We by no means suggest that summary judgment is never appropriate in cases such as these.").

The deference *Lohorn* stated was due to legislative descriptions of positions is certainly not as strong in this case where the position description was created by the executive (under what authority we do not know) and not enacted into law. However, the IDCMS job description is still evidence of the duties of the Chief ALJ to be scrutinized along with everything else introduced as evidence at this stage. *Id.*; *cf. Pleva*, 195 F.3d at 912; *Warzon v. Drew*, 60 F.3d 1234, 1240 (7th Cir. 1995); *Heck v. City of Freeport*, 985 F.2d 305, 310 (7th Cir. 1993). Also, in contrast to the bare "policymaking" label in *Lohorn*, the IDCMS job description was detailed and specific and did not mention the buzzword "policymaking". Moreover, Thompson attached the job description to his complaint as proof of his duties and affirmed its accuracy.[6] Because Thompson attached and relied upon the job description in forming the basis for his claims, it is proper to

---

[6] And Thompson, as stated before, did not challenge the validity of the description, rather he disputed the inferences drawn from it. On appeal, Thompson argues that the description of the Chief ALJ's duties were not *his* duties; however, that type of argument (personal performance overrides duties inherent in the position) has been consistently rejected. *E.g.*, *Tomczak v. City of Chicago*, 765 F.2d 633, 640-41 (7th Cir. 1985).

scrutinize the description to determine if it proves that the position is a policymaking position exempt from First Amendment strictures. In addition, as this case was decided on a motion to dismiss, the facts regarding the duties of the position are limited to the ones contained in the IDCMS job description attached to the second amended complaint.[7]

The IDCMS job description of the Chief ALJ's duties includes: directing subordinate staff, formulating procedures for the hearing programs, advising peer review committees, developing hearing program goals, and directing and implementing the program budget. Most of the Chief ALJ's time is spent on these activities, approximately eighty-five percent. While any one of these activities alone might not be considered policymaking, together they indicate that the Chief ALJ spends a considerable amount of time formulating policy and implementing broad goals.

Thompson counters that as Chief ALJ he, in fact, has very limited powers and is an impartial, quasi-judicial official. Two of the duties described in the IDCMS job description do support Thompson's assertions. The Chief ALJ is described as making "independent decisions" and exercising "judicial impartiality". However, those duties comprise less than fifteen percent of the Chief ALJ's overall responsibilities. Moreover, even in performing these duties the Chief ALJ reports to the director, preparing recommendations not independent decisions.

Based on the description alone, it is apparent that the Chief ALJ is a policymaking official within the IDPR. The Chief ALJ performs a variety of functions overseeing ac-

---

[7] Unlike *Milazzo I*, there are no conflicting allegations in the plaintiff's complaint, which we would be required to credit in the plaintiff's favor. 108 F.3d at 132-33. The plaintiff did not plead a single fact in his complaint regarding the duties of the position; instead he chose to attach the IDCMS job description.

tivities of subordinates, implementing policy and broad goals, and providing legal advice to numerous professional discipline boards. *See Elrod*, 427 U.S. at 367-68; *Branti*, 445 U.S. at 518. In attaching this job description and thus asserting that the description was true and correct—and not refuting or adding to the description in the complaint—Thompson pled himself out of court. *Cf. Americanos v. Carter*, 74 F.3d 138, 141 (7th Cir. 1996) (stating that dismissal pursuant to 12(b)(6) was not "based on an insufficient factual record" because the duties of the position were "easily ascertainable").[8] Because Thompson has not pled a claim upon which relief may be granted, we need not reach the issue of qualified immunity.

### D. *Count III: Due Process and Equal Protection Claims*

#### 1. Due Process

To demonstrate a due process violation in the employment context Thompson would be required to show, among other things, that he has a "legitimate claim of entitlement" to the position. *See, e.g.*, *Wolf v. City of Fitchburg*, 870 F.2d 1327, 1330 (quoting *Board of Regents v. Roth*, 408 U.S. 564, 577 (1972)). However, Thompson has essentially admitted that he has no property interest in the specific job of Chief ALJ. Thompson was only temporarily appointed to the position of Deputy Chief Counsel for the IDPR, and his transfer/promotion to the position of Chief ALJ was, admittedly, based only on a mutual understanding. *See Kolman v. Sheahan*, 31 F.3d 429, 435 (7th Cir.

---

[8] We reach this conclusion without directly addressing the political antecedents of how Thompson obtained the job in the first place, or the fact that Thompson remains employed in the position he was originally hired for, conceding that he lacked anything more than an "understanding" that he would stay Chief ALJ for the duration of his temporary appointment.

1994). Moreover, as the Illinois Civil Service Commission concluded, his temporary transfer—for stated benign reasons—violated no state laws or rules. *See Gustafson v. Jones*, 117 F.3d 1015, 1021 (7th Cir. 1997); 20 ILCS § 415/8b.19; 80 Ill. Admin. Code 320.410 (stating that employees may be transferred to similar positions within the agency or department employing them); 80 Ill. Admin. Code 302.822.

Finally, the result in the prior analysis (concluding Thompson pled himself out of court) precludes a finding for Thompson on this claim. If Thompson can be terminated, demoted, or transferred at will for political reasons, he has no property interest in the position of Chief ALJ. Because Thompson cannot demonstrate a property interest in the position of Chief ALJ, we conclude his due process claim was properly dismissed.

2. Equal Protection

To demonstrate an equal protection violation Thompson would need to show that "state government took an action against him that 'was a spiteful effort to 'get' him for reasons wholly unrelated to any legitimate state objective.'" *Pleva*, 195 F.3d at 917 (quoting *Esmail v. Macrane*, 53 F.3d 176, 179 (7th Cir. 1995)). Thompson alleges that Darr and Dudycz conspired with the Governor and subordinate officials to demote and transfer him because of his political activities in Maine Township.[9] Director Sherman responded by stating that the temporary transfer was for personnel not political reasons.

---

[9] Thompson also filed a claim, based on 42 U.S.C. § 1983, against Walter and Bob Dudycz, alleging they conspired with Director Sherman to deprive him of his job as Chief ALJ. The district court also dismissed that claim and Thompson failed to raise the issue in his opening brief, waving review in this court. *See Sere v. Bd. of Tr. of the Univ. of Ill.*, 852 F.2d 285, 287 (7th Cir. 1988).

While cooperation of high level officials in schemes to hire, transfer, or remove persons in even the lowest level positions are not unheard of in Illinois, *see generally Rutan v. Republican Party of Ill.*, 497 U.S. 62 (1990); *Tarpley v. Keistler*, 188 F.3d 788 (7th Cir. 1999), Thompson's equal protection claim fails for the same reasons that his due process claim did. If Thompson may be removed for political reasons from the position of Chief ALJ, it is not improper for Thompson to be transferred for the same reasons. *See Pleva*, 195 F.3d at 917; *Farr v. Gruber*, 950 F.2d 399, 402 (7th Cir. 1991).

E. *Denial of Leave to Amend the Second Amended Complaint*

Thompson filed a two count complaint on August 9, 2001. On August 21, 2001, Director Sherman moved to dismiss both counts. Thompson later filed a second amended complaint, adding a third count, on September 21, 2001. The court dismissed Count I with prejudice, and granted Director Sherman's motion to dismiss Count II, in part, on October 2, 2001. Then on October 4, 2001, the defendants moved to dismiss Count III and the remaining Count II claims. While the motion to dismiss was under consideration, on October 11, 2001, Thompson again sought leave to amend his complaint and file a third amended complaint. On October 30, 2001, the court dismissed Count III with prejudice and the remaining Count II claims without prejudice. The court denied leave to amend on November 6, 2001, concluding that further amendments would be futile.

Although a district court shall freely grant leave to amend "when justice so requires", the rule does not command leave be granted every time. FED. R. CIV. P. 15(a). It is well within the province of the district court to deny leave to amend if, among other things, there is undue

delay or undue prejudice would result to the opposing party if the amendment were allowed. *Id.*; *Ferguson v. Roberts*, 11 F.3d 696, 706-07 (7th Cir. 1993).

Even after the defendants' moved to dismiss the first amended complaint, Thompson failed to cure the deficiencies with the subsequent second amended complaint. Then, only after the defendants' moved to dismiss the remaining counts—including the added count in the second complaint—did Thompson attempt to cure the deficiencies that were evident since the first complaint. Thompson delayed in filing a motion to amend, twice, until after the defendants had moved to dismiss. The last delay prejudiced the defendants by forcing them to articulate reasons for dismissal, and, at the same time providing Thompson with the opportunity to correct mistakes facially apparent since the first complaint after the defendants had shown their hand. *See Doherty v. Davy Songer, Inc.*, 195 F.3d 919, 927-28 (7th Cir. 1999). The district court did not abuse its discretion in denying further leave to amend and curtailing this cat and mouse game of motions to dismiss followed by a motion to amend. *See Feldman v. American Memorial Life Ins. Co.*, 196 F.3d 783, 793 (7th Cir. 1999).

## CONCLUSION

Sometimes more is not better. All Rule 8 requires (with certain exceptions noted in Rule 9) is a short, plain statement showing the plaintiff is entitled to relief. The plaintiff in this case attached a document to his pleadings which showed he was not entitled to relief. AFFIRMED.

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*

USCA-97-C-006—8-7-02